May it please the Court, my name is Janet Belkoff-Shallin, and I'm here to represent the Gaines family in this matter. But before I proceed, I'd like to request three minutes for rebuttal. Just watch your time, Counsel, that's fine. Thank you. And Counsel, Judge Gould, I was going to say that I'm having a little trouble hearing you, and it may be the direction of the mic, so point it towards you where you're speaking, and speak up, please. Okay. I'll try to project. Okay. This case is about the failure of the Douglas County School District to educate Jeremiah and Nehemiah Gaines, who are two twin boys with autism. The reason this failure is such a calamity for Jeremiah and Nehemiah is for the very reason this Court appointed out in Amanda J., and that is autistic children have a very limited number of skills that they need on which they can base the rest of their education. So if they don't get these skills in this very narrow window of opportunity, there are lifelong repercussions. On the subject of autism, I'd like to turn this Court's attention to the lower court's analysis of the evaluations. It is our claim that the evaluations were not done properly, nor were they done in a timely manner. For one thing, for an evaluation to be timely and proper, the evaluation must assess in all areas of suspected disability. They must use a variety of instruments, and the instruments must be sound. That must — that means that they have to be valid and reliable. In this instance, if you look on page 13 of Judge Hicks's order, you'll see that there's not one autism test there. Well, counsel, let's start with the threshold question. And I gather on this particular point, both sides are in agreement that there was no notice given at the very beginning here. Is that correct? Yes. All right. No procedural safeguards given. That's right. And the ultimate decision by the hearing officer was that the parent should be compensated, but only for one-half of the cost of the separate test, which the parents undertook themselves. That was, yes, with regard to evaluations. Right. And that was affirmed by the district court. Affirmed, yes. Okay. Now, in terms of the timeliness, I was troubled by the sort of the suggestion that these things have to take place on kind of a split-second basis. Shouldn't the district be allowed at least a certain amount of reasonable time to not only set the stage so that the parent is able to be subject to an effective autism test, and then to reach its own independent conclusions? Yes and no. All right. For one thing, the NAC, the Nevada Administrative Code, allows a reasonable period of time for all of this to occur, and that's 45 days. I mean, is that a specific, I mean, is it statutory or not statutory, but a regulation that provides 45 days? It's the NAC Administrative Code, and what it does is the idea says a reasonable amount of time, and the Nevada Code states what that reasonable amount of time is. In Nevada, it's 45 days. Forty-five days from what? From the time in which the district is on notice of a disability, which in our case is May 7th. So they had to evaluate and start to provide services. In this instance, the school district did not do that. For one thing, they started to test. Yeah, but you say May 7th. Yes. Is that sufficient notice, what happened in May? Is that, at that point, was that sufficient notice to trigger? The way IDEA works is once the applications are turned into the child find office, the school district is on notice that the child has a disability. At that time, the procedural safeguards were not given. So there was no consent to evaluate. That's one of the problems here, and that is one of the items that all the lower courts recognized. The Gaineses were not given their procedural safeguards because when they turned in their application on May 7th, there was no notice of the consent to evaluate, nor were there procedural safeguards. All right. But there was no determination at that time or even a certification of some sort that this person qualified. At this point in time, there's no certification. It's not so much that they qualify. It's just that the school district is on notice. And that's when the clock starts ticking for them to begin. And, by the way, counsel. Yes, sir. They're on notice. They weren't on notice that the kids were autistic yet, right? No. No, absolutely not. They knew they were developmentally delayed. No. They didn't even know that at this point because they weren't on May 7th, no evaluations had occurred. The process was the same. All they had was an application, in effect. All they had was an application. They were just on notice that the parents thought that their child, that their children, these are twins, were disabled. What happened one week later, the center, the Brain Power Center, where they had originally gone for an open house out of concern that their children might be disabled, one week later, on May 10th, the center did an autism child find screen and determined that these children were autistic. This is on May 10th. Okay. Well, on May 10th, that occurred. When did the district know about that result? Well, that's a very interesting point. The school district was on notice on July 28th that the children were autistic. In a phone conversation between the Brain Power Center and Frankie McCabe, who is a key administrator of special education in the school district, she knew that the children, that the Brain Power Center said that they were autistic. She, and it's in the excerpts of record, she says she was on notice and she also said that she needed to evaluate against that. She took a trip to the Brain Power Center, saw the center, saw the children, came back and checked her logs. And indeed, Jeremiah and Nehemiah Gaines were in her logs. Yet the school district still did not evaluate them for autism until October. So some five months after they were considered autistic by the Brain Power Center, the school district finally got around to determining that they were autistic. Now, the determination by the Brain Center is not necessarily binding on the district, is it? Kagan. No, it's not. As is noted in Union School and Target Range, it is incumbent upon the school district to conduct their own evaluations. However, that doesn't mean that they cannot be apprised from the parents and from other organizations what their findings are and what their assessments are. All information is good, it's just that it's incumbent upon the school district to do their own evaluations. And it took them five months after the Brain Power Center did their evaluations to determine they were autistic. Let me ask you one question. Yes, Your Honor. Please tell me the range of time during which services were provided by the center, private center, from the beginning to the end. I think the total amount was around $14,000. Yes. It's close to $15,000. All right. When did it start and when did it end? They started, they were evaluated May 10th, and the boys started receiving services May 21st. So they received services May 21st? Yes. And the evaluation then, when, how long did those services last? Half a year later, services stopped on November 25th. And the reason the services stopped is because the parents could no longer afford to pay for the services. They had virtually bankrupted themselves in trying to apply and trying to acquire autism services for their children because the services were not being given by the school district. If I understand your position, your position is that had the notices been given back in May, the parents would have applied sooner, the evaluation would have taken place sooner or should have taken place sooner, and the services could have been provided by the district without having the parents pay from May to November. Well, once the parents turned in the application, there's no more obligation on the parents. This is when the clock started ticking for us. I'm not talking about default. I'm talking about causation. Okay. Then I'm not certain I entirely understand. All right. Here's my question to you. You're appealing from an order of the hearing officer, the State hearing officer and the judge, and we have a scope of review which limits our ability to review those administrative findings. Right. My question to you is what evidence is there that had the notices been given sooner, had the evaluation taken place sooner, the private expenditures which you were denied recovery of would have been provided for by the State? Okay. Well, if I understand you correctly, Your Honor, if the services had been given by the school district, there would have been no point. When do you claim the services should have been provided by the school district? The services should have been given by the school district according to the After May 7th, because that's when the clock starts ticking, because that's when they're on notice. However, services were never, autistic services were never provided to the children. They weren't provided initially after the first IEP meeting on August 25th, because at that point the school district still didn't even realize that the children were autistic. Well, 45 days after the application, the State has to commence evaluating. That's true. Now, do you concede that there's a period of time, such as mentioned by Judge O'Scanlan a moment ago, where the child has to become used to the people who are treating him? Yes. And you think that the day that the child is seen, he is diagnosed as autistic and services should be provided immediately? No, absolutely not. I don't believe that at all. What I believe is that within that 45 period, that's when the evaluations have to be done. They can be done sooner. They can be done later. But they have to be done within that time range, and then there has to be an IEP meeting at which time the child is given an eligibility classification, and at which time an IEP is constructed that provides the proper services. What's very interesting with regard to this 45. Let me ask you, just if I can, because we don't have much time. Sure. What is the earliest day you claim the district had to start providing, not evaluation, but services? Forty-five days. So it had to evaluate within the 45 days and provide services on the 45th day. And provide services. Thank you. That's true. Your Honor, I see that I am within my time. I realize that, counsel. One question, however, before you sit down. Hellgate. Any comments on the Hellgate case? Yes. It was a pleasure to read. The facts are very similar to the facts of our case. The issues are very similar. And the same cases that are cited by this Court in Hellgate are the very cases we cite, particularly Union School and Amanda Jay, to make the case that parents are not responsible for providing evaluations. It's the school district's responsibility. Nor can the parents, nor should the parents be blamed for not mentioning to the school district that their children are autistic. Thank you, counsel. You're going to save the rest of your time. Thank you, Your Honor. Good morning. May it please the Court. My name is Jim Hales. I have the pleasure of representing the district. With me at council tables is Anne Alexander, but I will take all the time for my argument. Very well. I would like to, I'm going to start with the Hellgate case. If I have time, I'm going to talk about Mark H. And also about the importance of giving deference to the hearing officer's decision. But let's start with Hellgate. One thing, one of the things that counsel and I share is an appreciation for that case because I think that case helps very much put into perspective how the district acted appropriately in this case. In other words, if you juxtapose that case and what happened in that case with what happened in this case, you'll get a very good idea of the spectrum of what a district does wrong and what a district does right. In the Hellgate case, the district knew in August, and again, it's August 2003 in both cases, by the way. The district knew in August that the child's physician had diagnosed an autism component that was somehow impacting his education. The parents brought that up when they hand-delivered that document to the district. And they talked about autism at that time. In September, and the district implemented the IEP that had been implemented in the previous district. In September, the district set up what they called a diagnostic IEP. It was in, I believe, and as a part of that, they reduced the hours from 13 1⁄2 a week to 5 hours a week. In November, the district finally got around to suggesting to the parents that they should go to another state agency to evaluate for autism because the district didn't have the ability to do that. No one criticized the district for that. They referred, but they did not refer for such a long period of time. The evaluation for autism was completed on May 3rd, and the IEP was written on May 22nd. At that time, it came back up to 12.5 hours. Now, let's contrast that to what happened in this case. The first time that this district had any hint of autism was that July 28th meeting where Frankie McCabe was at the Brain Power Center. Well, now, just stop there for a second. There was an application filed on May 7th, and wasn't that some sort of notice? That was notice that they needed to evaluate these children for disability, but the hearing officer noted that both at the time the mother came and at the initial screening evaluation on June 20th, there was no indication presented to the district that would have given them an indication that these children had autism. So the district was on notice that they needed to bring these children in and evaluate them, but they were not on notice that there was an autism component until July 28th. The director, these assessments that were conducted by the center, it actually ended up, we found out later when they were finally disclosed, that it consisted of one CARS childhood autism resource test of some sort. I thought I heard counsel say that by May 21st, 2003, services were being provided by the center for autism. That may well be, but the evaluation that was done immediately before May was a very sketchy autism evaluation. One CARS report would not have complied with what was required by Nevada statute, and in fact at the due process hearing, one of the people, I forget which one, the OT or somebody, said they still weren't sure that the children had autism. That was somebody from the center who had handled these children during the summer. So now I'm not trying to say that the district wasn't on notice on July 28th that they needed to evaluate for autism. They were. But what I'm saying is the information that had come to them was very sketchy, and the center had not conducted a complete evaluation anyway. Well, this is probably the best time to ask this question. Counsel mentioned several times that her position is that within 45 days of May 7th, the district had a duty to perform. Now, what's your response? Forty-five school days within May 7th. In other words, so it's in the summer, so you exclude the summer? Exactly. Because our people who are going to conduct the evaluation are on summer break. They're not available. To put together an IEP evaluation, you have to have the school psychologist, occupational therapist, speech pathologist, early childhood special education teacher. There was a special services specialist. Let me see if I follow this. This is like dealing with the Speedy Trial Act sometimes. Between May 7th and let's say the school year ends May 30th. I have no idea when it ends. But assuming that's the case, there's only about 10 days, 10 school days, 10 or 15 school days at the most. Then you exclude June, July, and August because there's no school? Correct. Then you pick up again, let's say September 1, if that's the start of the new term? Yes. Oh. Yes. And that's in NAC and it's cited in our book. We have a case that says that? The Nevada Administrative Code spells that out. And briefly, what happened in 1992, the Department of Education came and evaluated the State of Nevada and found that they were not being responsive to the requirement that this be done promptly. In response to that, the Nevada Administrative Code was passed and provided that 45 school day time period. The Department of Education then reviewed that later and gave a compliance letter at that point. Well, do you agree that May 7th is the trigger?  All right. Absolutely. Counsel, Judge Gould, I have a question. Since IDEA is a federal statute and the 45 days is set by a state regulation, my question is this. If IDEA requires things to happen in a reasonable time, what weight are we as a precedent as to what weight we give to the state regulation on 45 days? Either to the numerical number or to its exclusion of non-school days. I think the deference that you need to give, Your Honor, I don't have a case that would address that specific issue, but I would encourage the Court to be very deferential to the educational decisions made by the state agency. They know what they have to have in place to conduct an appropriate autism evaluation. And that time period where there's nobody there at the school prohibits them from conducting that evaluation. So I believe you should defer, particularly in light of the fact that the Department of Education has looked at this and withdrew the indication that they were not in compliance previously. And, Counsel, are you saying that you're not aware of any Ninth Circuit case that addresses the relationship between the time that IDEA requires for action and the state regulation like the 45-day provision here? I am not familiar with any case that the Ninth Circuit case that addresses and determines whether Federal law preempts, the Federal law of timely evaluation preempts the 45 days. I'm not aware of that. There does appear to be some Federal law that allows some 60-day time periods unless the State law provides otherwise. And I believe that's referenced in our brief. And is that 60 days, 60 school days? That one is 60 calendar days. Calendar days. Again, unless State law applies otherwise. All right. Counsel, I have a feeling our questions interrupted your development of Hellgate. So if you want to go back to that, that's fine. I would be delighted. Thank you. In Hellgate, the district showed almost no initiative. The parent mentioned autism, and the district nonetheless reduced the level of education. In our case, when the mother came to the initial evaluation, we knew from the 28th of July that there may be an autism component. The mother came to the evaluation on August 15th and did not mention autism. When they came back to run the IEP meeting on the 25th of August, the district, after when the meeting was winding down, the district asked, what about autism? The mother said, well, the center is saying they have autism, but I'm not so sure. And that's in her testimony, which is in the record on appeal. The district nonetheless took the initiative. They know Amanda J. I mean, it's understood that if there's a potential of autism, the district must respond to that. So the district then took the initiative and said we're going to put these kids in an environment which allows us to run the types of assessments that are required for autism. If you look at the Nevada Administrative Code, again cited in our brief, it identifies what you must do in order to determine whether or not these children have autism. That includes seeing these children in different settings, evaluating their ability to obtain educational experiences and to assimilate the information. There's no blood test that you can run or any other test that gives you an instant snapshot that a child has autism. So the district did what was reasonable and found the children to be disabled, developmentally delayed, and provided the service so that the children could get used to the environment. In Hellgate, the district referred the parents to some other agency and then forgot about it, apparently, or didn't pay due attention to what they should have in order to make sure that the assessments were completed. In the district, we did our own assessments and we completed our own evaluations. In Hellgate, it took seven months to put into place an IEP which addressed the autism from the day that the autism was first known to the district. In our case, it took about two months, which was about 28 school days. And again, as I've mentioned, you've got to have the kids in school for a while so you can evaluate them. In Hellgate, the parents challenged the appropriateness of the services proposed, and they felt that the extended year services were appropriate and the district felt otherwise. In this case, once we got to the IEP that addressed autism, the parents never really, at the time of the due process hearing, were not contesting the level of services that were being offered by the district. They contested whether the district could actually do what they said they were going to do. And without giving the district a chance to come good on their obligations, they withdrew the children from out of the school district. And then one other comparison. The district reduced the services to five hours a week while they waited seven months to get the autism evaluation. In our case, we provide the level of services that were appropriate, as found by the hearing officer, that were appropriate for that disability, the general disability that they were found under. And this proposed service level increased as additional information was obtained by the district determining that the children had autism. Well, now, what does Hellgate tell us with respect to whether the director's phone call was equivalent to the evaluation here in this case? The director's phone call to special services, to our employees? Excuse me. I'm trying to put Hellgate in context with our case, which you're helping us with. But it seems to me that when Hellgate talks about the child must be assessed in all areas of suspected disability, when is the suspected triggered? Okay. The suspicion in this case was July 28th. But the point here is you can't bring the child in on August 15th and do the evaluations on that day. That's not possible. And the Hellgate, the court in Hellgate never criticized what they called the interim IEP. It was not a subject of dispute with the court as to whether or not the child should have been put into this interim position while he got used to the classroom, while the children got used to the teachers, so the children could evaluate, so the teachers could evaluate the children over time. That was not a subject of criticism. And so the district was within it. There's really no case. Amanda J. and Hellgate say once you suspect autism, you need to act on it. It doesn't say that you need to immediately, based on a suspicion, immediately start providing services. You must act on it and you must assess time. Kennedy. Didn't the Brain Center tell the director on July 28th, 2003, not only that they had evaluated autism, but that they had been treating for autism for two months? That may well be. I'm not sure. But that still doesn't impact the district's responsibility to conduct their own evaluations and determine whether or not the children truly do have autism. So you're saying that the district, even at that point, as long as school was out, had no obligation to do any evaluation? Well, under the facts of this case, it was July 28th when they found out the children were already scheduled for August 15th for the evaluation. So it's not like we're dealing with two weeks here. And I submit that that two-week time period was reasonable. You know, if that information was passed on May 10th, we may have a different set of facts. I don't know. But that's not our facts. And what's your position? After August 15th, when they were evaluated for autism, why didn't you start providing services then? They were not evaluated for autism on August 15th. They were evaluated to determine whether or not they had a disability. And they had a general disability of delayed development. Now, those assessments were run, and it was confirmed that there was delayed development. The district was still concerned about autism, and that's when they brought it up to the parent. And the district then, they didn't say it to the parent on the 15th, but on the 25th at the IEP meeting, the district, the mom said, I don't think they have autism. The district said, we would like to get them in the program and have a look at them in five, six, eight weeks after we've had a chance to have them here and then run some further assessments for autism. Counsel, is it significant that in Hellgate, Dr. Gould's evaluation was given to the district, whereas the early evaluation here was not? Well, it would have been nice for the district to have had the evaluation from the Brain Center because all information is helpful. But I have to tell you, I think under Amanda J., once the district has some notification of autism, it's got an obligation to respond, whether it comes from a physician or whether it comes from a director. And even if the director doesn't give the report, at least the way the county, the district that I represent acts is, we have a report of possible autism. We need to check it out. And that's what they did. Thank you, Counsel. Your time has expired. We will hear from Ms. Belko-Shallon. You have a little bit of time left. Thank you, Your Honor. A few points I'd like to make. You don't construct an IEP unless you have the evaluations because the evaluations are the engine for the IEP. They determine present levels. And after the present levels of performance are determined, then it's determined what sort of services you provide. By virtue of the fact that the school district had an IEP meeting on August 25th, they assumed they must have done proper evaluations, which obviously were done in the summer. Now, the school district doesn't just pack up its bags in the summer. Frankie McCabe was working. She was in her office to get the phone call on July 28th. The school district says they evaluated the children over the summer. So, yes, they were, you know, the school district is working in the summer. But yet our point is the evaluations were so inadequate, in fact, they don't even rise to the level of an evaluation under the statute of IDEA, because when you look at the IEP on August 25th, you'll see that there are no assessments listed, except for an AGS, and no scores. And this is very, very relevant. There are no scores listed in the August 25th IEP. So how can you determine present levels of performance? And how can you determine what services the children get? Because they did not assess for autism, they didn't even label them autistic by that first IEP. They labeled them as developmentally disabled. It's only later on, when they finally did the Wetzler and the Peabody and the Kauffman, lo and behold, and the CARS, I might add, which is not some sketchy little assessment which opposing counsel alluded to, but it's a major autism assessment, when they finally did all of these assessments, the children were considered autistic. So the case just argued will be submitted for decision and the court will adjourn. Thank you. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals, my circuit, and now the Court, this session, or this Court, for this session, will now stand adjourned. Thank you.  Thank you. I know it's probably tough in such a short amount of time. I know. I've had a little time to meditate. A couple of days ago. A couple of days ago. I really thought I was blown away. You were terrified. Well, I thought I was prepared for anything to say. There's so many more important issues. It's kind of like taking a test. Absolutely. I'm sure the professor is kind of like that. Exactly. You think you do this and so forth. Yeah, yeah. I'm kind of like that. I don't know what else to say. I don't know what else to say. Okay. I'll leave you with that. Yeah. Yeah. I have something I can answer your question. Yeah, you can. You are actually quite articulate too. I'm just saying. Yeah, I like this. I like that you kept looking at each of these issues. And making sure that they know your focus on them. No more excuse. No, no. Especially when they are the ones that are making decisions. We'll see. I mean, if Paul was troubled. Okay. Okay. He was troubled. Yeah. I'm happy to be in both of them. We'll see. It's exciting to be in both of them. Hopefully, we're well qualified. We'll see. I know, the dates were always so pressed up. I'm so glad to have a look at that. Yeah, yeah. You do seem to believe that. I'm so glad. This was my first big day. What is it? Bring it all together. How long are we going to down? Just about two minutes. Two minutes? Yeah. Yeah. Do you want water or something? Right here, right here. I believe we can do this one. Yes. This is the first time you've been part of it? Well, no. The first time we had it, it was more of a skill fair. Okay. Before this, I was just basically on my own. Oh, that's a real career change. Well, I'm still using it a little bit. What I did do was criminal justice for a year. But my major was basically doing government. Do you like working for the court? Yeah, it's really interesting. I'm glad I got a chance to be able to do both of those jobs. Thank you. Thank you. Thank you. Thank you. Thank you. Yeah, yeah, there's that. So thank you for all your kind words and your listening and so much over with. Thank you so much. Thank you.
judges: O'scannlain, Gould, Bea